No. 94,203

MERLE J. FIESER, M.D., *Appellee,* v. KANSAS STATE BOARD OF
HEALING ARTS, *Appellant.*

(130 P.3d 555)

Opinion filed March 17, 2006.

*Mark W. Stafford,* general counsel, Kansas Board of Healing Arts, argued the cause and was on the brief for appellant.

*Brian C. Wright,* of Law Office of Brian C. Wright, of Great Bend, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This is an appeal involving a final order of the Kansas Board of Healing Arts (Board) revoking Merle J. Fieser's license to practice medicine. The district court reversed the Board's order,

and the case was transferred from the Court of Appeals to this court pursuant to K.S.A. 20-3018(c).

We must decide whether the Board correctly interpreted K.S.A. 65-2837(a)(2) when it concluded that Fieser was professionally incompetent without requiring proof that her deviations from the applicable standard of care proximately caused patient injury. The district judge rejected the Board's interpretation.

A Kansas doctor's license may be revoked if the "licensee has committed an act of unprofessional or dishonorable conduct or professional incompetency." K.S.A. 65-2836(b). K.S.A. 65-2837(a)(2) defines "professional incompetency" as, among other things, "[r]epeated instances involving failure to adhere to the applicable standard of care to a degree which constitutes ordinary negligence, as determined by the [B]oard." In this case, Fieser failed to adhere to the applicable standard of care in 8 out of the 10 instances cited in the initial petition.

After several days of hearings, the Presiding Officer rejected Fieser's effort to dismiss the action, concluding that, under K.S.A. 65-2837(a)(2), "a failure to adhere to the applicable standard of care . . . constitutes ordinary negligence. This negligence is a breach of duty imposed upon a licensee . . . . Injury need not be shown in order for the Board to proceed under K.S.A. 65-2836 and K.S.A. 65-2837." Fieser's conduct, according to the Presiding Officer, "constitute[d] professional incompetency as defined at K.S.A. 65-2837(a)(2)." Further, Fieser's license should be revoked, in view of the Board's purpose to protect the public from "unprofessional, improper, unauthorized, and unqualified practice of the healing arts."

The Board reviewed the Presiding Officer's decision and issued a final order adopting his findings and conclusions. The Board also specifically denied Fieser's request for a stay during judicial review, finding there was a "substantial threat to the public health and welfare" from Fieser's continued practice. According to the Board, despite the absence of proof in the hearings, there had been injury to at least four of the patients whose treatment by Fieser formed the basis of the petition. We also note that Fieser had admitted

her failures to adhere to the standard of care at the hearing and had conceded that one patient was injured as a result.

The district judge rejected the Board's argument that its interpretation of the statute was entitled to deference under the doctrine of operative construction. Exercising de novo review, the judge accepted Fieser's argument that the statute's reference to "ordinary negligence" meant "actionable negligence," *i.e.*, a deviation from the applicable standard of care *plus* proximate cause of injury to a patient. The district court then reversed the Board's order of revocation. This appeal followed.

### Standard of Review

Although this case involved an administrative agency's interpretation of a statute in the first instance, we hold that the correct standard of review for this appeal is de novo. We are called upon to interpret K.S.A. 65-2837(a)(2) and apply it to undisputed facts. Interpretation of a statute raises a question of law subject to unlimited appellate review. *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998). Under the doctrine of operative construction, an administrative agency's interpretation of a statute it is charged with enforcing is entitled to judicial deference in certain circumstances. See, *e.g.*, *Kansas Bd. of Regents v. Pittsburg State Univ. Chap. of K-NEA*, 233 Kan. 801, 809, 667 P.2d 306 (1983) (quoting *Southwestern Bell Telephone Co. v. Employment Security Board of Review*, 189 Kan. 600, 607, 371 P.2d 134 [1962] (" '[T]he operative interpretation given thereto by the officers and official boards whose duties are to carry the legislative policy into effect is helpful, and may be entitled to controlling significance . . . in judicial proceedings.' "); *State v. Helgerson*, 212 Kan. 412, 413, 511 P.2d 221 (1973) ("This court has long given great weight under the doctrine of operative construction to the interpretation of a statute by the administrative body charged with enforcing the statute"). However, "[t]he final construction of a statute [always] rests within the courts." *In re Tax Exemption Application of City of Wichita*, 255 Kan. 838, 842, 877 P.2d 437 (1994); see also *Bomhoff v. Nelnet Loan Services, Inc.*, 279 Kan. 415, 420, 109 P.3d 1241 (2005) (judicial deference to agency's legal rule not

compelled when law under examination not regulation promulgated by agency). The Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.*, under which this appeal arises, permitted the district court and would permit us to grant relief from the Board's ruling if we discern that the Board "erroneously interpreted or applied the law." K.S.A. 77-621(c)(4).

## *Analysis*

K.S.A. 65-2837(a) is contained in the Kansas Healing Arts Act, K.S.A. 65-2801 *et seq.* The statute reads in pertinent part:

"(a) 'Professional incompetency' means:

(1) One or more instances involving failure to adhere to the applicable standard of care to a degree which constitutes gross negligence, as determined by the board.

(2) Repeated instances involving failure to adhere to the applicable standard of care to a degree which constitutes ordinary negligence, as determined by the board."

The Board relied on K.S.A. 65-2837(a)(2) to revoke Fieser's license. Fieser argues that the word "negligence" as used in that subsection requires proof of all four of the elements that make the tort of negligence actionable: (1) the existence of a duty, (2) an act or omission in breach of that duty, (3) proximate cause, and (4) an injury. See, *e.g., South v. McCarter* 280 Kan. 85, 94, 119 P.3d 1 (2005) (quoting *Schmidt v. HTG, Inc.,* 265 Kan. 372, 396-97, 961 P.2d 677, *cert. denied* 525 U.S. 964 [1998]) (setting forth the elements of a negligence cause of action). In her view, the Board's reading of the word "negligence" to include only the existence of a duty and an act or omission in breach of that duty is unsupported by the purpose of the Healing Arts Act. The Act's goal is protection of the public, she argues, and "there is no damage done to the public by a physician whose non-standard care does not cause injury."

Fieser relies on *Rogers v. Shanahan,* 221 Kan. 221, 223-24, 565 P.2d 1384 (1976), which recites the presumption that "the legislature intend[s] a different meaning when it use[s] different language in the same connection in different parts of [a] statute." This presumption is violated, she argues, if the phrase "failure to adhere

to the applicable standard of care" and "negligence" are synonymous.

The Board maintains that the statute does not require it to put on evidence of all of the elements a plaintiff must prove in a civil action for damages caused by negligence. Rather, the statute requires only proof of repeated instances in which the licensee deviated from the applicable standard of care. Requiring more, the Board says, would run contrary to the Act's purpose to protect the public from incompetent licensees.

When interpreting a statute, a court strives to give effect to the intent of the legislature. The legislature is presumed to have expressed its intent through its language; and, when that language is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. An appellate court may not speculate as to the legislative intent behind the language, and it will not read into a clear statute language not readily found within it. See *State v. Marsh*, 278 Kan. 520, 537, 102 P.3d 445 (2004). There is no need to resort to canons of statutory construction if the text of a statute is clear. See *State v. Sodders*, 255 Kan. 79, Syl. ¶ 4, 872 P.2d 736 (1994).

Black's Law Dictionary defines "negligence" as "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation; any conduct that falls below the legal standard established to protect others against unreasonable risk of harm . . . . The term denotes culpable carelessness." Black's Law Dictionary 1061 (8th ed. 2004). In short, the word "negligence," standing alone, refers to only two of the four elements required in a civil action for damages caused by negligence. Those two elements are: (1) the existence of a duty and (2) an act or omission in breach of that duty. Kansas decisions also use "negligence" or "negligent act" to mean duty and breach. See *Fisher v. Kansas Crime Victims Comp. Bd.*, 280 Kan. 601, 615, 124 P.3d 74 (2005); *Natalini v. Little*, 278 Kan. 140, 143-46, 92 P.3d 567 (2004); *Nold v. Binyon*, 272 Kan. 87, Syl. ¶ 5, 31 P.3d 274 (2001).

In the medical context, the duty of a doctor to a patient is known as "the applicable standard of care," and the concept of breach is expressed as "deviation from the applicable standard of care" or "failure to adhere to the applicable standard of care." See, *e.g.*, *Dawson v. Prager*, 276 Kan. 373, 375, 76 P.3d 1036 (2003).

Fieser is correct that the legislature equated the phrase "failure to adhere to the applicable standard of care" with "negligence" in this medical context, but these authorities demonstrate that this is not problematic or particularly surprising. If these authorities did not exist, we might need to turn to the presumption recited in *Rogers* to explain the meaning of the word "negligence" in the statute and otherwise engage in statutory construction. As things stand, we need not. The use of the word "negligence" in K.S.A. 65-2837(a)(2) is clear and unambiguous.

This reading is further supported by a broader textual analysis, *i.e.*, if we look at the entire text of K.S.A. 65-2837(a)(2). The phrase "failure to adhere to the applicable standard of care" appears as part of the phrase "*repeated* instances involving failure to adhere to the applicable standard of care," which provides for the *number* of acts or omissions that will rise to "professional incompetency." "Negligence" appears as part of the phrase "ordinary negligence," which defines the *severity* of the licensee's act or omission in any these multiple instances. "Ordinary negligence" is defined as "lack of ordinary diligence" and is "most commonly used to differentiate between *negligence* and *gross negligence*." Black's Law Dictionary 1063 (8th ed. 2004).

This makes perfect logical and legal sense when we expand our textual analysis still farther to consider the wording of both K.S.A. 65-2837(a)(1) and K.S.A. 65-2837(a)(2). See *State v. Huff*, 277 Kan. 195, 203, 83 P.3d 206 (2004) (several provisions of act *in pari materia* must be construed together). The first subsection, in contrast to the subsection that concerns us here, makes even an isolated instance of failure to adhere to the applicable standard of care a ground for revocation of a medical license. There is one condition: The single instance must be so serious that it is equivalent to "gross negligence." K.S.A. 65-2837(a)(1).

These provisions make the legislature's intention obvious. It set up a heirarchy of sins. If a doctor deviates from the applicable standard of care only once and at only an "ordinary negligence" level of seriousness, his or her license is not jeopardized. If, however, the doctor either repeatedly engages in deviations from the standard of care owed to patients at an "ordinary negligence" level or engages only once in a breach of duty so serious that it can be called "gross negligence," the Board may revoke that doctor's license to practice.

Although further support of our interpretation is not required, we note briefly that the legislative history of K.S.A. 65-2837(a)(2) is consistent with our interpretation.

In 1969, the legislature added language to the Healing Arts Act to authorize the Board to impose discipline for a finding of "professional incompetency." See L. 1969, ch. 299, sec. 10 (H.B. 1549). No definition of that phrase was included in the statute at that time. Ten years later, the legislature created a definitional subsection in K.S.A. 65-2837 that read: "(a) 'Professional incompetency' means: (1) one or more instances of gross negligence; or (2) repeated instances involving ordinary negligence." See L. 1979, ch. 198, sec. 4.

The next significant change came in 1986, when the legislature amended the definitions to their current form, inserting the standard of care language. L. 1986, ch. 229, sec. 42 (H.B. 2661). The amendments were part of an extensive overhaul of the Act focused on tort reform. Enhanced Board disciplinary power was sought, in the hope such peer review would decrease the number of medical malpractice lawsuits filed. See Minutes, House Judiciary Comm., Interim Comm. Report, January 21, 1986.

The Kansas Medical Society, the Kansas Bar Association (KBA), and the Kansas Trial Lawyers Association supported all provisions to strengthen the Board's disciplinary power. Minutes, House Judiciary Comm., January 28, 1986. And the KBA specifically addressed the amendment at issue in its advisory letter to the House committee. It clarified that the standard of care language would allow the Board, among other things,

"the power to set standards of care. Section 35(a) [now K.S.A. 65-2837(a)] also gives the board the power to determine when 'gross' or 'ordinary' negligence has occurred.

"These is a dual functions [*sic*]—one medical, and one legal—within the same licensing board's jurisdiction. . . . The board sets standards of care . . . . [O]nce they've chosen a standard of care they can make a decision like a jury [*sic*] there has been a deviation from that standard of care, and that 'ordinary negligence' has occurred. This dual authority is important." Minutes, House Judiciary Comm., January 28, 1986. (KBA attach.).

Our interpretation also is supported by extrajurisdictional case law. Courts from several of our sister states considering similar statutory language have upheld health care licensing boards' decisions imposing discipline for medical "negligence" despite no proof of patient injury.

Under a New York statute defining professional incompetency applicable to the medical professions as, *inter alia*: "[p]racticing the profession *with negligence* on more than one occasion"; "[p]racticing the profession *with gross negligence* on a particular occasion"; "[p]racticing the profession *with incompetence* on more than one occasion"; or "[p]racticing the profession *with gross incompetence*," there is no requirement for proof of injury. (Emphasis added.) 16 N.Y. Education Law § 6530(a) 3, 4, 5, 6 (McKinney 2001). See *Matter of Gant v. Novello*, 302 App. Div. 2d 690, 694, 754 N.Y.S.2d 746 (2003) (discipline of doctor for repeated failures to meet standard of care constituting gross negligence, despite lack of evidence of actual patient harm); *Matter of Loffredo v. Sobol*, 195 App. Div. 2d 757, 760, 600 N.Y.S.2d 507 (1993) (state medical board not required to prove negligence caused death of child). Courts in North Carolina have interpreted statutes authorizing discipline for *"negligence"* and *"incompetence"* not to require proof of injury to the patient. (Emphasis added.) See 11 N.C. Gen. Stat. Ann. § 90-41 (a)(12), (14) (2005); *In re McCollough v. N.C. State Bd. of Dental Examiners*, 111 N.C. App. 186, 193, 431 S.E.2d 816 (1993) (injury, damage not relevant to reviewing of administrative boards decision). And the California Code authorizing discipline for *"unprofessional conduct,"* defined as, *inter alia*, *"gross negligence," "repeated negligent acts"* and *"incompetence,"* has been

interpreted to require no showing of injury. (Emphasis added.) See 3A. Cal. Bus. & Prof. Code § 2234(b),(c),(d) (West 2003); *Kearl v. Board of Medical Quality Assurance*, 189 Cal. App. 3d 1040, 1053-54, 236 Cal. Rptr. 526 (1986) (failure to record vital signs constitutes gross negligence; injury, harm to patient not required before action taken against physician).

Finally, Fieser also attempts to buttress her position on this appeal with an argument regarding the inapplicability of res ipsa loquitur and through analogy to mandatory reporting requirements under risk management provisions. See K.S.A. 65-4921 *et seq.* We have fully considered these arguments and have determined that they are without merit.

Reversed.

DAVIS, J., not participating.

LARSON, S.J., assigned.